**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **CHAPTER 13** |
| **MIKEL JOE DAVIS and** | ) | |
| **DOROTHY ELAINE DAVIS** | ) | |
| | ) | |
| Debtors. | ) | **CASE NO.  05-72683** |

―――――――――――――――――――――――――――――――――――

| | | |
|---|---|---|
| **MIKEL JOE DAVIS and** | ) | |
| **DOROTHY ELAINE DAVIS** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding No. 06-07126** |
| | ) | |
| **ABN AMRO MORTGAGE GROUP and** | ) | |
| **FNB SOUTHEAST MORTGAGE** | ) | |
| **CORPORATION** | ) | |
| | ) | |
| Defendants. | ) | |

―――――――――――――――――――――――――――――――――――

**MEMORANDUM OPINION**

Mikel Joe Davis, the male Debtor, obtained a residential mortgage loan from FNB Southeast Mortgage Corporation (hereinafter "FNB") upon property he owned jointly with his wife, Dorothy Elaine Davis, the female Debtor.  To secure the repayment of that loan they executed a deed of trust in favor of FNB, which soon thereafter sold the loan to ABN AMRO Mortgage Group (hereinafter "ABN AMRO"), which in addition to becoming the owner of the loan also took over its servicing.  After that sale took place but before Mr. Davis was notified that such had occurred, Mr. Davis made a mortgage payment to FNB.  Rather than simply forward that payment to ABN AMRO, however, FNB a number of weeks later refunded the loan

payment to Mr. Davis with no instructions as to what he should do with it or any explanation

other than that it was for an overpayment on the loan.  Unfortunately he did not then send the

payment to ABN AMRO himself or make any inquiry as to why the refund had been made.

There is no evidence before the Court as to what Mr. Davis understood about the refund which

had been made to him or why he did not send it along to ABN AMRO.  From that bad beginning,

things only got worse with a continuing history of the loan being a month delinquent, the

eventual referral of the loan for foreclosure, advertising the property for foreclosure and the

eventual filing by the Debtors of a Chapter 13 petition in this Court to try and save their home.

This adversary proceeding constitutes the Debtors' attempt to hold FNB and ABN AMRO to

account for the alleged mishandling of the plaintiffs' residential mortgage loan, which they

allege caused them both financial and emotional injury and was the precipitating cause of their

bankruptcy filing.  The Amended Complaint consists of three counts, the first asserting breach of

contract by both defendants, the second claiming negligence on the part of ABN AMRO, and the

third alleging breach of fiduciary duty by both defendants.  The specific matters presently before

the Court are ABN AMRO's Rule 12(c) "Motion to Dismiss Counts II and III of Plaintiff's [sic]

Amended Complaint,"[1] such defendant's separate Motion for Summary Judgment against Mrs.

Davis on the basis that she was not a party to the loan, but only to the deed of trust securing the

 loan, and she remains a co-owner of the property because no completed foreclosure occurred,

---

[1] This Rule is made applicable to adversary proceedings in bankruptcy by Bankruptcy
Rule 7012(b).  A Rule 12(c) motion is referred to in the Rule as a "Motion for Judgment on the
Pleadings."

and FNB's Motion for Summary Judgment against both plaintiffs as to all counts.[2]  This Court previously dealt with ABN AMRO's Motion to Dismiss the original Complaint, which it partially granted and partially denied in its Memorandum Decision and Order of March 15, 2007. Counsel for the parties have filed memoranda supporting their respective Motions and opposition to same and the Motions are ready for decision.  For the reasons noted below, the Court will grant both of ABN AMRO's Motions and will grant FNB's Motion except only with respect to Mr. Davis as to Count I of the Amended Complaint.  The end result of these rulings will be that this adversary proceeding will continue only as to the contractual claims of Mr. Davis under Count I of the Amended Complaint against both defendants.

## FACTUAL ALLEGATIONS

On or about November 14, 2002, Mr. and Mrs. Davis[3], the Debtors and the plaintiffs in this proceeding, entered into a mortgage transaction involving a note and deed of trust with defendant FNB.  Within days thereafter, specifically on November 22nd, FNB sold both the loan and its servicing to defendant ABN AMRO, although the Davises were not apprised of that fact until on or about January 17, 2003, when they received a letter dated January 7 to such effect.  Because they had not been made aware of such transfer earlier, they

---

[2] The grounds asserted in FNB's Motion are the alleged absence of any common law duty owed by it to either of the parties, the fact that Mrs. Davis was not a party to the loan itself, the alleged absence of any fiduciary duty owed to either Mr. or Mrs. Davis, the denial that any negligence or fault on its part proximately caused the injuries claimed by the Debtors, and the failure to mention any claim specifically against FNB in the Debtors' bankruptcy schedules.

[3] Discovery has established that while both Mr. and Mrs. Davis signed the deed of trust, only Mr. Davis was a party to the note.

3

made the mortgage payment due January 1 to FNB.  FNB did not forward this payment to ABN

AMRO in a timely manner.  In fact discovery has revealed that FNB did not ever forward the

initial loan payment to ABN AMRO but refunded the payment by means of its check dated

February 27, 2003 which it sent to Mr. Davis but without any explanation for its basis or what he

should do with it.  Although the plaintiffs at all times had required insurance coverage in force,

ABN AMRO claimed that it did not have proof of such insurance coverage and therefore "force

placed" separate coverage to protect it from the possibility of uninsured casualty loss.  This

action was despite the fact, according to the Amended Complaint, that both an annual premium

for such insurance had been paid at settlement and that payments for eleven additional months of

premium for such insurance were paid out of settlement into the escrow account.  There ensued,

according to the allegations contained in the Amended Complaint, a continuing and very

frustrating series of exchanges in which ABN AMRO claimed that all required payments had not

been made or proof of insurance coverage provided and demanded payment for the "force

placed" insurance and assessed late payment charges, and the Debtors repeatedly but to no avail

supplied the documentation necessary to establish that such contentions were inaccurate.

Ultimately ABN AMRO decided to foreclose, refused to accept and actually returned to Mr.

Davis two mortgage payments, and referred the account to legal counsel for the purpose of

foreclosure.  Their home was advertised for sale by foreclosure and the Davises were ultimately

forced to file a petition in this court to halt that process.[4]  They allege that these events were so

stressful that they are entitled to $100,000 in damages for their "pain, suffering and mental

---

[4]    ABN AMRO asserts in its rebuttal brief that the foreclosure sale was stopped by ABN
AMRO on July 7, 2005 and not by the plaintiffs filing for bankruptcy on July 13, 2005.

anguish such as to place their marriage in jeopardy."[5]

The plaintiffs make, among many others, the following specific allegations

regarding FNB and ABN AMRO in the Amended Complaint:

XXXV.  Your Plaintiffs allege that pursuant to the terms of the aforesaid note and Deed of Trust the Plaintiffs prior to the Notice of Foreclosure had made all required payments in a timely manner.

XXXVI.  Your Plaintiffs allege that the Defendants and both of them overcharged them, failed to correctly apply payments made[.] [sic] . . .

XLVIII.  The Defendants [sic] ABN-AMRO owed the Plaintiffs and both of them a duty of care in handling and processing of the escrow accounts and payments of the Plaintiffs.

XLIX.  The Defendants [sic] ABN-AMRO  failed to exercise the degree of care required of a lending institution in handling of the Plaintiffs [sic] accounts and payments.

L.  As a direct and proximate result of the Defendants [sic] ABN-AMRO negligent and indifferent handling of the payments of the Plaintiffs and both of them they have suffered financial loss amounting to approximately $125,400.00 (One Hundred Twenty Five Thousand Four Hundred Dollars)[.][sic] . . .

LI.  As a direct and proximate result of the Defendants [sic] ABN - AMRO's negligent and indifferent handling of the payments of the Plaintiffs and both of them, the Plaintiffs have suffered pain, suffering and mental anguish such as to place their marriage in jeopardy for which they should be compensated in the amount of $100,000. (One Hundred Thousand Dollars). . . .

LIII.  The Plaintiff's [sic] allege the Defendant's [sic] ABN-AMRO and FNB Southeast violated there [sic] fiduciary duties as escrow agents by failing to 1.) maintain accurate records as to entities to be paid from the amounts held in escrow, 2.) Failing to maintain said funds in separate accounts, 3.) Failing to make accurate payments in a timely manner as directed. . . .

---

[5]  Paragraph # LI of the Amended Complaint.

LV.  As a direct and proximate result of said breach of fiduciary
duty the Plaintiffs have suffered monetary losses up to $57,500.00
(Fifty Seven thousand Five Hundred Dollars)[.][sic]

In its Motion for Summary Judgment, ABN AMRO notes that the plaintiffs have admitted the following facts:  that the loan with ABN AMRO is solely in the name of Mr. Davis; that Mrs. Davis's name is not on the mortgage loan; that only Mr. Davis executed the November 14, 2002 note and signed the loan closing documents; Mrs. Davis signed only the November 14, 2002 deed of trust; that as of November 1, 2007, Mr. and Mrs. Davis are still the owners of record of the property; and that the property secured by the deed of trust has not been foreclosed upon.

This Court will include in its Findings of Fact the contractual provisions contained in the note signed by Mr. Davis and the deed of trust signed by both Mr. and Mrs. Davis.  Copies of these two documents are attached as exhibits to this opinion and are hereby incorporated by reference.  The only provision of the note imposing any express obligation upon its holder is with respect to the borrower's right to prepay, which is not material to the facts of the dispute before the Court.  While the provisions of the note are quite succinct, those of the deed of trust are extensive and detailed.  The Court makes specific reference to the following provisions of such deed of trust:  the definition of Mr. Davis as the "Borrower" and FNB as "Lender" along with its address, both on page 2; the second paragraph of section 1 of the Uniform Covenants, dealing with the making of payments on the loan, on page 4; and the following other Uniform Covenants contained in sections # 2 ("Application of Payments or Proceeds," pages 4 and 5), # 3 ("Funds for Escrow Items," pages 5 and 6), # 13 ("Joint and Several Liability; Co-Signers; Successors and Assigns Bound," 1st paragraph, page 10), # 16

6

("Governing Law; Severability; Rules of Construction," page 11), and # 20 ("Sale of Note;

Change of Loan Servicer; Notice of Grievance," page 12); and # 22 ("Acceleration; Remedies,"

page 13) under Non-Uniform Covenants of such document.


## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of

28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the

District Court on July 24, 1984.  It is clear that both the Debtors' residential property and this

claimed pre-petition cause of action are assets of the bankruptcy estate and that the resolution of

this dispute between the mortgagors and the mortgagee will  "affect" such estate.  *See Pacor,*

*Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984); *Humboldt Express, Inc. v. Wise Co. (In re*

*Apex Express Corp.*, 190 F.3d 624, 632 (4th Cir. 1999); 1 *Collier on Bankruptcy* ¶ 3.01[4][c][ii]

at pp. 3-24 and -26 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev).  The plaintiffs

allege that this adversary proceeding is a "core" bankruptcy matter within the contemplation of

11 U.S.C. § 157(b)(2).  ABN AMRO states that it is without sufficient information or knowledge

to admit or deny the allegation that this is a core proceeding and, therefore, denies such

allegation.  FNB denies that the alleged causes of action set forth in the Amended Complaint

constitute core proceedings as the causes of action and claims arose prior to the filing of the

bankruptcy petition.  However, FNB consents to the entry of a final order by the bankruptcy

judge.  While not all actions brought by bankruptcy debtors attempting to pursue purported pre-

petition claims are "core" bankruptcy proceedings, *see Humbolt Express*, 190 F.3d at 630-33, the

Court concludes that it is not necessary at this point to reach a conclusion as to whether this

particular dispute is "core" or "non-core" because the questions before the Court are purely ones

of law, namely, whether the factual allegations made in the Amended Complaint, as modified by

the undisputed facts revealed during the process of discovery, are sufficient to present triable

causes of action against the defendants or either of them in this adversary proceeding. *See id.* at

630.

The purported causes of action asserted in the Amended Complaint are matters of

applicable state law and have no basis in federal law.  The applicable state law is that of Virginia

because the plaintiffs live in Virginia, the loan was made in Virginia upon real estate located in

Virginia, and the deed of trust securing the loan expressly provides in section 16 that the

governing state law is "the law of the jurisdiction in which the Property is located."

Accordingly, this Court will be guided by decisions of the Supreme Court of Virginia and federal

court decisions applying Virginia law.


## ABN AMRO'S RULE 12(c) MOTION TO DISMISS COUNTS II AND III

Under Federal Rule of Civil Procedure 12(c), made applicable to adversary

proceedings by Bankruptcy Rule 7012(b), "[a]fter the pleadings are closed . . . a party may move

for judgment on the pleadings."  In considering a motion for judgment on the pleadings under

Rule 12(c), the facts presented in the pleadings and the inferences drawn therefrom must be

viewed in the light most favorable to the non-moving party.  *Edwards v. City of Goldsboro*, 178

F.3d 231, 248 (4th Cir. 1999).  Dismissal is inappropriate unless it is clear that the non-moving

party can prove no facts sufficient to support the claims for relief.  *Id.* at 244.

In its Rule 12(c) Motion, ABN AMRO argues that none of the claims made in the Amended Complaint arise from anything other than a breach of contractual terms of the mortgage loan and that, absent the mortgage loan, ABN AMRO owes no duty to Mr. Davis. Additionally, ABN AMRO states that because the relationship between Mr. Davis and ABN AMRO is one of debtor/creditor, ABN AMRO owes no fiduciary duty to the plaintiffs and only a contractual duty to Mr. Davis under *Broaddus v. Gresham*, 181 Va. 725, 26 S.E.2d 33 (1943). Taking the allegations made in the Amended Complaint as true, ABN AMRO asserts that Mr. Davis can only proceed with a breach of contract claim and not, as a matter of law, proceed against ABN AMRO under theories of negligence or breach of fiduciary duty. Therefore, ABN AMRO requests that the Court dismiss Counts II and III of the Amended Complaint.

Count II alleging negligence follows Count I alleging breach of contract. ABN AMRO urges that the second count simply alleges a negligent breach of a contractual duty and therefore does not set forth a valid cause of action. It is certainly true that as a general proposition there is no cause of action under Virginia law for negligent breach of contract. If the duty allegedly breached is purely one of contract, no cause of action exists for negligent breach of that contractual duty. *See Umstead v. Chase Manhattan Mortgage Corp.*, 2005 U.S. Dist. LEXIS 42500, *10 (W.D. Va. 2005)*; Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 136, 509 S.E.2d 494, 497 (1999); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558, 507 S.E.2d 344, 347 (1998). As the Supreme Court of Virginia stated in *Holles*, "[t]o establish a cause of action for negligence, the duty alleged to have been tortiously breached must be a common law duty, not a duty arising between the parties solely by virtue of a contract." 509 S.E.2d at 497. Whether such a common law duty is owed is a question of law. *Id. Holles* dealt

9

with a claim of a nursing home resident who was injured as a result of the criminal conduct of a stranger and the defendant provided management services to the plaintiff's landlord.  The Court held that there was no "special relationship" between the plaintiff and the defendant which imposed any common law duty upon such defendant.  *Id.* at 498.  The *Holles* decision followed earlier decisions of the Court which had held that no "special relationship" existed between a landlord and a tenant which imposed upon the former a duty to protect against the foreseeable risk of criminal conduct of others.  *Klingbeil Management Group Co. v. Vito*, 233 Va. 445, 447-48, 357 S.E.2d 200, 210 (1987); *Gulf Reston, Inc. v. Rodgers*, 215 Va. 155, 158, 207 S.E.2d 841, 844 (1974).  A very recent decision from the Supreme Court of Virginia, *Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 645 S.E.2d 290 (2007), has provided clarification as to under what circumstances an independent common law duty exists outside of a contract when the relationship between the parties originates in that contract.  In *Augusta Mutual*, the Court dealt with the issue of the legal sufficiency of an insurance company's pleading in a third party action for damages arising out of an insurance agent's allegedly fraudulent misrepresentations regarding the condition of a home that the insurance company agreed to insure.  The Court held that, because the "only duties allegedly violated by the agent emanate exclusively from the parties' preexisting contractual relationship," the insurance company failed to properly state claims for fraud in the inducement or breach of fiduciary duty.  *Id.,* 645 S.E.2d at 291. The duties that the agent allegedly violated by making fraudulent representations about the condition of the home arose solely by virtue of the Agency Agreement between the insurance company and the agent, which specifically required due diligence on the part of the agent.  The Court also held that but for the existence of the Agency Agreement, the agent would not have owed any

10

fiduciary duty to Augusta Mutual. "That certain of those fiduciary duties arose by implication

does not alter the result." *Id*. at 295. "The law of torts provides redress only for the violation of

certain common law and statutory duties involving the safety of persons and property, which are

imposed to protect the broad interests of society." *Filak v. George*, 267 Va. 612, 618, 594

S.E.2d 610, 613 (2004). As any fiduciary duty allegedly breached existed solely because of the

contractual relationship between Augusta Mutual and the agent and its employee, Augusta

Mutual failed to assert a valid claim for breach of fiduciary duties.

In the case before this Court the alleged injury is not one of physical injury to the

plaintiffs or to their property, but is two-fold in nature, a personal injury in the nature of

emotional distress claimed to have resulted from ABN AMRO's alleged knowingly wrongful

attempted foreclosure of their residence, as well as a breach of their contractual and other legal

rights with resulting injury to their economic interests. The relationship created between FNB

and the Davises was clearly one of contract and ABN AMRO is the assignee of the interests of

FNB in such contract. The complaints against FNB relate to its failure to provide timely notice of

its sale of the loan to ABN AMRO, its failure to forward the mortgage payment to the assignee,

and its rather tardy refund of the first payment sent to FNB with no explanation of the reason for

doing so or the need to send the payment on to ABN AMRO. The acts complained of attributable

to ABN AMRO do not relate to any actions by it as mortgagee as such but rather to its actions as

servicer of the mortgage loan and its referral of the loan for foreclosure. There would be no

difference in the nature of the wrong allegedly done to the mortgagors by ABN AMRO if it had

simply served as the servicer of the loan for FNB and had recklessly mishandled the account. The

plaintiffs have not cited to this Court any authority that a mortgage loan servicer has any common

11

law duty to the mortgagor to use even the slightest duty of care in the performance of its business

operations so that mortgagors' loan payments are properly credited, their payments into escrow

accounts are properly credited and disbursed to the relevant tax authorities and insurance

companies, and their loans are not referred for foreclosure even though the mortgagors have

"made all required payments in a timely manner." Amended Complaint, ¶ XXXV. The plaintiffs

specifically allege that ABN AMRO did owe them "a duty of care in handling and processing of

the escrow accounts and payments of the Plaintiffs," ¶ XLVIII, and that such defendant "failed to

exercise the degree of care required of a lending institution" in the handling of their transactions,

¶ XLIX. The potential for harm to mortgagors whose residential mortgage loan is wrongfully

referred for foreclosure even though their loan is not in default seems self-evident. That the

degree of harm from a completed wrongful foreclosure might well exceed any purely contractual

measure of damages resulting from such an act also seems evident. Nevertheless, the test is not

the degree of potential harm to the mortgagors, but whether the mortgagee and loan servicer owed

them any common law duty which would authorize damages beyond a purely contractual

measure. The Court applies the same standard under Rule 12(c) as it applies under a motion

pursuant to Rule 12(b)(6). This Court may not dismiss a complaint under Rule 12(b)(6) (F.R.B.P.

7012(b)(6)) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief." *Barksdale v. Nationwide Mut. Ins. Co.*, 2007 WL

200955 at *1 (W.D. Va. 2007) and *Umstead*, 2005 U.S. Dist. LEXIS 42500 at *4, both quoting

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). After mature consideration the Court concludes

that, under the factual allegations and the undisputed facts, the plaintiffs for the reasons noted in

this decision will not be able to establish that either FNB or ABN AMRO was subject to any

common law duty or any fiduciary duty owed to either Mr. or Mrs. Davis with respect to their loan servicing operations.

The plaintiffs assert in their memorandum in opposition that the defendants owed them a duty of care, outside of the contract, in three respects:  First, the defendants had a duty to maintain proper records and give proper credits to payments made.  Second, after having been notified of a disputed claim as to application of payments, they owed the plaintiffs a duty of due diligence to investigate their claims and to take no action against the plaintiffs while such investigation was being conducted.  Third, and most importantly according to the plaintiffs, they owed the plaintiffs a fiduciary duty as escrow agents in the handling of funds that did not belong to them.  ABN AMRO relies on *Broaddus*[6] for the proposition that there is no fiduciary duty owed in the debtor/creditor relationship.  Because the relation between Mr. Davis and ABN AMRO arises out of a mortgage loan and is one of debtor/creditor, ABN AMRO asserts that it owes no fiduciary duty to Mr. Davis and owes no duty to Mrs. Davis as the loan is solely in the name of Mr. Davis.

---

[6] In *Broaddus*, the court dealt with the question of whether the relationship between the parties was one of debtor and creditor or beneficiary and trustee.

> The question frequently arises as to whether the relation created is a trust or a debt. . . .  "A trust involves a duty to deal as fiduciary with some specific property for the benefit of another. A debt involves a merely personal obligation to make payment of a sum of money to another. A creditor as such has merely a personal claim against his debtor.  He can enforce his claim by judicial proceedings to reach the debtor's property and subject it to the satisfaction of his claim, . . . There is a fiduciary relation between trustee and beneficiary but not between debtor and creditor as such."

26 S.E.2d at 35-36.

13

The problem with the plaintiffs' assertion that these loan servicing responsibilities imposed any common law duties under Virginia law, however, is that a review of the provisions of the deed of trust makes clear that the mutual rights and responsibilities of the parties regarding these matters were spelled out in that document.  In that deed of trust the borrowers agreed to a detailed contract governing the making of payments, their application, the making, handling and disposition of escrow funds, the possibility of sale of the loan by the original lender and the servicing of the loan, the rules governing responsibility to any co-signer of the deed of trust who was not also an obligor on the note, governing law, default and foreclosure.  All of the complaints made by the Debtors concern alleged negligent or other wrongful performance of responsibilities which would not exist independent of the mortgage loan.

Furthermore, there is no suggestion that the plaintiffs had any basis to place any special trust or confidence in FNB as their lender or any assignee or servicing agent of same. Absent such a showing or a relationship recognized by Virginia law to imply such a position of trust and confidence, such as attorney and client, guardian and ward, and principal and agent, there is no basis under such law to impose any fiduciary duty upon either FNB or ABN AMRO owed to mortgage loan obligors. "A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence."  *H-B Ltd. P'ship v. Wimmer*, 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979).  The plaintiffs have not cited to the Court any authority, and for its part the Court has found none, holding that there exists under Virginia law any fiduciary duty owed by a residential mortgagee or residential mortgage loan servicer to either the loan obligors or the mortgagees.

14

While there may be very good policy reasons for the law to impose a duty of care upon mortgage loan servicers in light of the importance of home ownership in the national economy and the effect upon ordinary citizens of mishandled servicing of  mortgage loans, it is not the responsibility or prerogative of this Court to give birth to such a duty.  That prerogative belongs to Congress and the state legislatures.  If any additional regulation or legal duty in this important area of our national life is warranted, that decision should be made by the legislative branch of the government, which is best equipped to weigh the competing public policy concerns and interests and make the appropriate decision thereon.

For the reasons set forth, the Court grants ABN AMRO's Motion to Dismiss as to Counts II and III.

### ABN AMRO'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF DOROTHY ELAINE DAVIS

A motion for summary judgment made pursuant to Federal Rule of Civil Procedure 56 is applicable to adversary proceedings in bankruptcy by virtue of Bankruptcy Rule 7056.  Rule 56 provides that such a motion can be granted only if the court is persuaded by the evidence produced before it "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  The standards under which courts consider motions for summary judgment are well established.  Upon a motion for summary judgment, a court must view the facts, and any inferences to be drawn from those facts, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  A genuine issue of fact exists "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

       Both defendants seek the entry of summary judgment in their favor against Mrs. Davis on the basis that she has never been a party to the note and her property interests in the residence remain unaffected as foreclosure was never completed and she remains a joint owner of the property with her husband. It is undisputed at this point that Mrs. Davis is not a co-signer of the note and that her contractual obligations and rights flow from the deed of trust, which she did co-sign, and her joint ownership with Mr. Davis of the residential property securing the mortgage loan. Accordingly, to the extent that the matters complained of by the Debtors are simply breaches of the loan contract, that is the note, the defendants' position seems entirely justified. The plaintiffs have alleged that they were parties to the mortgage loan transaction, not that Mr. Davis was a party and Mrs. Davis was an intended third party beneficiary of the contract. The deed of trust expressly provides in section 13 that "any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing the Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument," is not personally obligated to pay any amount to the lender, and consents to any modification or extension of the loan as the lender and the borrower may agree without such co-signer's consent. The only contractual right accorded to a co-signer of the note who is not also a party to the note appears to be in the second paragraph of section # 22 ("Acceleration; Remedies") as follows:

       If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law.

The claim asserted by Mrs. Davis, however, has nothing to do with any failure of notice to her of the foreclosure sale, but rather of the events which preceded ABN AMRO's decision to call the loan and request the trustees under the deed of trust to foreclose. To the extent, if any, that such a decision was a breach of any contractual duty owed to Mr. Davis, it breached no contractual duty owing to Mrs. Davis.

ABN AMRO further asserts that it owes no duty to Mr. Davis absent the mortgage loan. Therefore, ABN AMRO owes no duty to Mrs. Davis as the loan was not in her name. As ABN AMRO does not owe a common law duty of care to the plaintiffs, ABN AMRO could not have been negligent with respect to Mrs. Davis. Additionally, as the relation between Mr. Davis and ABN AMRO arises out of a mortgage loan and is one of debtor/creditor, ABN AMRO asserts that it owes no fiduciary duty to either of the plaintiffs. Therefore, ABN AMRO states that Mrs. Davis cannot recover damages against ABN AMRO under a theory of negligence or breach of fiduciary duty and Counts II and III of the Amended Complaint should be dismissed. These assertions have been discussed and ruled upon in the previous section regarding ABN AMRO's Motion to Dismiss. For the reasons set forth, the Court grants ABN AMRO's Motion for Summary Judgment as to Mrs. Davis.

## FNB'S MOTION FOR SUMMARY JUDGMENT

FNB also moves for summary judgment against the plaintiffs on the grounds that the plaintiffs' claims, if any, arise solely out of a contractual relationship with FNB pursuant to a mortgage loan. Therefore, any duty owed by FNB was limited to the terms of the loan. As Dorothy Elaine Davis was not a party to the note, she cannot seek damages from FNB for breach

17

of any alleged duty predicated upon the note.  The plaintiffs made no allegation of breach of the

terms of the deed of trust.  The plaintiffs assert in response that all of their payments were

processed one month late by ABN AMRO and that these late payments were the direct result of

FNB's negligent behavior and relate directly back to failure of FNB to properly credit the

plaintiffs' January 2003 payment.  FNB further asserts that the plaintiffs' breach of contract and

negligence claims against it[7] fail because no common law duty exists between the plaintiffs and

FNB, there is no evidence of a breach of any contractual duty and for lack of causation.  FNB

refunded the initial payment to Mr. Davis; Mr. Davis did not tender that payment to ABN

AMRO.  FNB asserts that the note was shortly thereafter brought current and remained current

until December 2004.  In excess of two years after the origination of the note, the plaintiffs

experienced financial difficulties causing Mr. Davis to default.  Even if FNB breached a duty with

respect to the initial payment, the breach – over 2 years prior to the events causing the default –

could not be the proximate cause of the claimed damages.  As no fiduciary relationship existed

between the plaintiffs and FNB, the latter asserts that the claim for any breach of such duty must

also fail.  The plaintiffs respond that the escrow payments were for the benefit of both the

plaintiffs and the banks; therefore a fiduciary duty did exist.  These assertions likewise have been

discussed and ruled upon in the previous sections regarding ABN AMRO's Motion to Dismiss

and Motion for Summary Judgment.

---

[7] FNB notes in its Response to the Amended Complaint that the allegations of negligence in Count II are directed only at ABN AMRO.  The plaintiffs have not made any request to amend their Amended Complaint to include FNB in Count II although they have argued such defendant's negligence in their brief opposing such defendant's Motion.  In view of the Court's ruling, such issue is rendered moot because the plaintiffs have no claim for negligence against either ABN AMRO or FNB.

Finally, FNB asserts that all claims asserted against FNB are barred because the plaintiffs failed to disclose or list any potential claim against FNB as an asset in their Chapter 13 Petition, Statement of Financial Affairs, Schedules or Plan.  While the plaintiffs did disclose the claims against ABN AMRO, FNB and ABN AMRO are separate and distinct legal entities and the mere disclosure of claim against ABN AMRO cannot constitute disclosure of a claim against FNB.  In support of its position, FNB relies on *Monroe County Oil Co., Inc. v. Amoco Oil Co.*, 75 B.R. 158, 162 (S.D. Ind. 1987): "It is well settled that '[w]hen a debtor fails to disclose claims that it has during the bankruptcy proceedings, it is equitably estopped from bringing the claims after the approval of the plan of reorganization.'"  Relying on *Eubanks v. Federal Deposit Ins. Corp.*, 977 F.2d 166, 174 (5th Cir. 1992); *In re Walker*, 198 B.R. 476 (Bankr. E.D. Va. 1996); and *Engh v. Wells Fargo Home Mortg. (In re Engh)*, No. 04-00128, 2007 Bankr. LEXIS 2994 (Bankr. D. S.C. 2007); FNB asserts that debtors are barred from bringing a lawsuit that was not disclosed as an asset of the bankruptcy estate.  The plaintiffs, however, assert that the disclosure made by them contained adequate information under 11 U.S.C. § 1125(a) such as to enable the holders of claims to make an informed judgment about the plan and that both ABN AMRO and FNB had clear notice of these claims.  Therefore, their claims against FNB should not be barred.

11 U.S.C. § 521(a)(1) provides that the debtor shall file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities and a statement of financial affairs, among other documents.  The Code and Rules impose an "express, affirmative duty to disclose all assets, including contingent and unliquidated claims."  *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207-08 (5th Cir. 1999).  A debtor is required to disclose all potential causes of action.  *Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n*, 932 F. Supp.

859, 867 (E.D. Tex. 1996).  A debtor may be judicially estopped from asserting a claim that was

not listed in his schedules.  Invoking the doctrine of judicial estoppel, "courts have prohibited

litigants from 'playing "fast and loose,"' . . . or 'blow(ing) hot and cold,' by barring them from

taking inconsistent positions during the course of litigation."  *United Virginia Bank/Seaboard*

*Nat. v. B. F. Saul Real Estate Inv. Trust*, 641 F.2d 185, 190 (4th Cir. 1981).  The rationale for

decisions invoking judicial estoppel to prevent a debtor who failed to disclose a claim from later

asserting that claim "is that the integrity of the bankruptcy system depends on full and honest

disclosure by debtors of all of their assets.  The courts will not permit a debtor to obtain relief

from the bankruptcy court by representing that no claims exist and then subsequently to assert

those claims for his own benefit in a separate proceeding."  *Rosenshein v. Kleban,* 918 F. Supp.

98, 104 (S.D.N.Y.1996)

      In *Monroe County,* the court held that the doctrine of equitable estoppel barred the

debtor from asserting the claims brought in its amended complaint.  The court noted that all of the

claims were in existence during the bankruptcy proceedings, yet the debtor did not disclose any of

the claims in its bankruptcy petition, plan of reorganization or disclosure statement.

> Equitable estoppel may arise when a party is silent though it had an
> opportunity to speak and an imperative duty to do so. . . .  In a Chapter
> 11 bankruptcy proceeding, the debtor must file a disclosure statement
> which contains "adequate information." 11 U.S.C. § 1125(b). Among
> other things, the debtor must disclose any "litigation likely to arise in
> a nonbankruptcy context."

75 B.R. at 162.  Although the debtor stated in its plan of reorganization that it retained "all causes

of action it may have under the United States Bankruptcy Code," it made no reference to

litigation likely to arise in a nonbankruptcy context.  The court held that "[w]hen a debtor fails to

disclose claims that it has during the bankruptcy proceedings, it is equitably estopped from

20

bringing the claims after the approval of the plan of reorganization." *Id.*

The court in *Eubanks* held that the debtor's claims against a lender, brought in state court and removed to federal district court, were barred by the doctrine of res judicata as the claims were not listed on a schedule of assets, disclosure statement or brought to the attention of the bankruptcy court at any time.  The court found that the debtor knew of the claims prior to confirmation of his plan, "yet failed to bring the claims, perhaps the most significant assets of his estate, to the attention of the bankruptcy court or the creditors as mandated by the Bankruptcy Code and Rules."  *Eubanks*, 977 F.2d at 174.  The court held that the order confirming the plan was res judicata of the instant claims and the claims were barred.

In *Walker*, an individual debtor filed a voluntary petition under Chapter 11 and an amended plan was confirmed.  Over two years after confirmation of the plan, a motion for judgment was filed by a general partnership, the debtor and other related parties seeking damages against NationsBank based on events that took place prior to the filing of the debtor's petition.  Based on *Monroe County* and *Eubanks*, the court noted in a footnote that the debtor admitted that he lacked standing to pursue the state court litigation against NationsBank, formerly Sovran Bank, because he did not disclose any potential causes of action against the banks during the pendency of his bankruptcy case.  The debtor conceded that confirmation of a Chapter 11 plan serves to bar the institution of any suit based upon pre-petition events when the debtor does not disclose the potential cause of action.  *In re Walker*, 198 B.R. 476 n.3 (Bankr. E.D. Va. 1996).

The Court is not persuaded by FNB's affirmative defense or plea in bar that the Debtors failed to disclose the claim against it in their schedules.  The Debtors did fail to disclose any claim or potential cause of action against FNB in their petition, statement of financial affairs,

21

schedules or plan.  However, the Debtors did list the litigation claim against ABN AMRO, against

which most of their allegations are made, on Schedule B as "Breach of Contract lawsuit against

ANB-AMRO."  There are two main aspects of this estoppel defense: a debtor should not be able

to enforce a pre-petition litigation claim for his own post-petition benefit when he has concealed

the existence of the claim from the bankruptcy trustee, and a debtor should be prevented from

taking inconsistent positions in judicial proceedings as to the existence or non-existence of a pre-

petition enforceable claim.  Neither are applicable here.  The general claim was disclosed even

though one of the defendants was not mentioned and no assertion has even been advanced by

FNB that the debtors were attempting to conceal the claim from the bankruptcy trustee.  Indeed,

the claim has been brought in an adversary proceeding in the bankruptcy court, which is about as

clear evidence as one might imagine that there was no intent to conceal anything from any party

in interest in the bankruptcy case.  Accordingly, the Court is satisfied that the facts of this case do

not raise any equitable estoppel against the assertion of whatever claims may exist as a result of

this mortgage loan against FNB as well as ABN AMRO.  Neither do they suggest any effort by

the Debtors to conceal any relevant information from their creditors or the bankruptcy trustee.

This defense is wholly without merit.

        For the reasons set forth in the previous sections regarding ABN AMRO's Motion

to Dismiss and Motion for Summary Judgment, the Court grants FNB's Motion for Summary

Judgment, except only with respect to Mr. Davis as to Count I of the Amended Complaint.

CONCLUSION

22

For the reasons stated above, the Court by its separate order will grant both of
ABN AMRO's Motions and will grant FNB's Motion except only with respect to Mr. Davis as to
Count I of the Amended Complaint.

This 22nd day of February, 2008.

_William F. Stone, Jr._

_____
UNITED STATES BANKRUPTCY JUDGE

062790174 9

# NOTE

Loan #: 4220172

NOVEMBER 14, 2002                    PENNINGTON GAP                         VIRGINIA
[Date]                                    [City]                                   [State]

ROUTE 1 BOX 607, PENNINGTON GAP, VA  24277
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   57,500.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is   FNB Southeast Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   7.500   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st   day of each month beginning on  January 1st, 2003   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  December 1st, 2032   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  440 SOUTH MAIN STREET   P.O. Box 1538, HARRISONBURG, VA 22801
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $   402.05   .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

VIRGINIA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N(VA) (0005)                Form 3247 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                          Initials:  M D

THIS IS TO CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL NOTE AS EXECUTED

Settlement Agent

EXHIBIT
A

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     fifteen    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



**10. UNIFORM SECURED NOTE**

 This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

 If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

 If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_Mikel J. Davis_ _____ (Seal)
MIKEL J DAVIS     -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

_____ (Seal)
    -Borrower

*[Sign Original Only]*

 This is to certify that this is the Note described in and secured by a Deed of Trust dated  November 14, 2002
on the Property located in   County of Lee          , Virginia.

My Commission Expires:   October 31, 2006.

           _Carol L. Brown_
           Notary Public

 -5N(VA) (0005)        Page 3 of 3           Form 3247 1/01

*0213568*

Return To:   FNB Southeast Mortgage Corporation
             440 SOUTH MAIN STREET   P.O. Box 1538
             HARRISONBURG, VA 22801

Tax Map Reference #: 35-(A)-124

RPC/Parcel ID #:

Prepared By:
             FNB Southeast Mortgage Corporation
             440 SOUTH MAIN STREET   P.O. Box 1538
             HARRISONBURG, VA 22801
             540-434-2062

———————————————[Space Above This Line For Recording Data]———————————————

# DEED OF TRUST

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by   MIKEL J DAVIS and DOROTHY ELAINE DAVIS, his wife

Borrower (trustor), to  RUSSELL K HENRY JR                                    , as

Trustee, for the benefit of   FNB Southeast Mortgage Corporation              , as

as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**VIRGINIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3047 1/01

VMP®-6(VA) (0102)

Page 1 of 15                    Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

0213569

**(A) "Security Instrument"** means this document, which is dated  November 14, 2002
together with all Riders to this document.
**(B) "Borrower"** is  MIKEL J DAVIS

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  FNB Southeast Mortgage Corporation

Lender is a  CORPORATION
organized and existing under the laws of  THE STATE OF NORTH CAROLINA
Lender's address is 440 SOUTH MAIN STREET  P.O. Box 1538, HARRISONBURG, VA
22801
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is  RUSSELL K HENRY JR

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia. Trustee's address is
440 SOUTH MAIN STREET, HARRISONBURG, VA 22801
**"Trustee"** is

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia. Trustee's address is

**(E) "Note"** means the promissory note signed by Borrower and dated  November 14, 2002
The Note states that Borrower owes Lender  Fifty Seven Thousand Five Hundred and
no/100.                                                                  Dollars
(U.S. $   57,500.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    December 1st, 2032   . The interest rate
stated in the Note is  Seven and one half

                                                     percent (      7.500      %).
If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in
accordance with the attached Adjustable Rate Rider.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider       ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider  ☐ Other(s) [specify]

*0213571*

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

        COUNTY                 of                       LEE              :
     [Type of Recording Jurisdiction]                      [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE

VMP-6(VA) (0102)                 Page 3 of 15        Initials: _____        Form 3047  1/01

0213572

which currently has the address of

                    ROUTE 1 BOX 607                                    [Street]
        PENNINGTON GAP            [City/County], Virginia 24277         [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all
easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and
additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this
Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has
the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances
of record. Borrower warrants and will defend generally the title to the Property against all claims and
demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform
covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real
property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as
selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

    Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay
interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring
the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply
such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding
principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower
might have now or in the future against Lender shall relieve Borrower from making payments due under
the Note and this Security Instrument or performing the covenants and agreements secured by this Security
Instrument.

    2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest
due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note.

0213573

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Initials: _M D_
_NEW_

*0213574*

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*0213575*

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of

*0213576*

progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage

0213577

Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

Initials: *MD*
*DED*

*0213578*

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the

-6(VA) (0102)                    Page 10 of 15          Initials: _____          Form 3047   1/01

02135779

permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of

 -6(VA) (0102)
.®

Page 11 of 15

Initials: _M D_
_N ED_

Form 3047   1/01

*0213580*

Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

*C213581*

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.**

-6(VA) (0102)          Page 13 of 15          Initials: _MD_          Form 3047   1/01
                                                       _DED_

*0213582*

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

✓ *Mikel J Davis* _____ (Seal)
        MIKEL J DAVIS                                    -Borrower

_____

✓ *Dorothy E Davis* _____ (Seal)
        DOROTHY ELAINE DAVIS                    -Borrower

_____ (Seal)          _____ (Seal)
                                        -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                        -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                        -Borrower                                                      -Borrower



0213583

**STATE OF VIRGINIA,**          LEE            **County, ss:**

The foregoing instrument was acknowledged before me this November 14, 2002          by
MIKEL J DAVIS and DOROTHY ELAINE DAVIS, his wife.

My Commission Expires:                    *Carol L. Brown*
                                          Notary Public
October 31, 2006.

```
                              INSTRUMENT #0213568
                         RECORDED IN THE CLERK'S OFFICE OF
                                    LEE ON
                           NOVEMBER 19, 2002 AT 08:47AM
                           BENJAMIN F. DAVIDSON, CLERK
                         BY: Brenda Willett      (DC)
```

0213570

## EXHIBIT A

All that certain lot or parcel of land lying and being in the JONESVILLE

MAGISTERIAL DISTRICT of Lee County, Virginia, bounded and further described as follows,

to-wit:

TRACT 1, containing 0.593 acre and as shown upon a plat dated November 5, 2002, Drawing Number: C-5131-244-21, surveyed by Cumberland Partners, L.L.C. which plat is to be recorded in the Office of the Clerk of the Circuit Court of the County of Lee, Virginia, in Plat Cabinet Slide D-7, being bounded and further described as follows:

BEGINNING at a 5/8" rebar (set this survey) on right of way line of VA Rte 645 corner to Tract 2; thence continuing along said right of way N 32° 27' 55" W 16.48 feet; thence N 28° 14' 53" W 89.17 feet; thence N 30° 32' 15" W 45.92 feet; thence N 33° 19' 09" W 42.90 feet; thence N 35° 24' 52" W 90.94 feet crossing a gravel entrance to a 5/8" rebar (set this survey); thence leaving said right of way N 63° 00' 00" E 88.89 feet to a 5/8" rebar (set this survey); thence continuing along the L& N Railroad right of way S 35° 00' 00" E 275.16 feet to a 5/8" rebar (set this survey); thence leaving said right of way and along a cyclone fence S 56° 36' 49" W 103.45 feet to the point of BEGINNING, upon which a modular home is situated.

BEING a portion of the same property conveyed unto Mikel J. Davis and Dorothy Elaine

Davis, his wife, by deed dated March 12, 1992, from Barbara S. Wilson, divorced, which deed is

of record in the Office of the Clerk of the Circuit court of the County of Lee, Virginia in Deed

Book 400, Page 607 and by Quitclaim deed dated November 6, 2002, from Ralph E. Terry, Jr., et

ux, which deed is recorded in the Office of the Clerk of the Circuit Court of the County of Lee,

Virginia, as Instrument No: 0213380.